**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

VICTORIA CHRISTENSEN

     Plaintiff,

v.

HCA HEALTHONE LLC dba PRESBYTERIAN ST. LUKES HOSPITAL, and
LISA MARIE WHITE GRISS M.D.


     Defendants.

---

**COMPLAINT**

---

The Plaintiff, Victoria Christensen ("Christensen" or the "Plaintiff"), by and through his counsel, Blake Embry of Embry & Associates, LLC, respectfully alleges for her Complaint as follows:

**JURISDICTION AND VENUE**

1.  At all times relevant herein, the Plaintiff, Victoria Christensen, was a resident of the State of Colorado and under the care of Defendants HCA-HealthOne dba Presbyterian St. Luke's Hospital and Lisa Marie White Griss M.D.

2.  At all times herein, the Defendant HCA-HealthOne LLC dba Presbyterian St. Lukes Hospital (hereinafter "HCA-PSL") was a foreign corporation doing business in Colorado and holding itself out as a full-service medical facility, available to treat patients such as Victoria Christensen (hereinafter "Christensen" or the "Plaintiff"). HCA-PSL is located in

1

the City of Denver, Colorado, and is a "participating hospital" within the meaning of 42 USC section 1395dd(c)(2).

3.      At all times pertinent herein, HCA-PSL had an emergency department, including ancillary psychiatric and/or pediatric neurology services that were routinely available to the emergency department, capable of providing appropriate medical screening examination and care to stabilize an individual's emergency condition.

4.      At all times pertinent herein, Defendant Griss was a resident of Colorado, employed by Defendant HCA and HCA-PSL, and served as the hospitalist charged with the duty to ensure that Christensen received a neurological consult during her stay at HCA-PSL.

5.      This action is based upon a violation of the Emergency Medical Treatment and Labor Act, 42 USC section 1395dd, et. seq. (hereinafter the "EMTALA" or "The Act") and the amount in controversy otherwise exceeds the minimal jurisdiction amount of the Court.

6.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1343.

7.      This Court has supplemental jurisdiction over the pendant state claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events or omissions giving rise to this action occurred within the District of Colorado.

## PARTIES

9.      The Plaintiff incorporates all preceding paragraphs as though set forth fully herein.

10.     The Plaintiff, Victoria Christensen, the Plaintiff, resides at 3099 Quarterland St, Strasburg, Colorado 80136, and is a citizen of Colorado.  Born on December 11, 1998, Christensen is currently eighteen (18) years old.   As previously stated, at all times relevant herein, the

Plaintiff, Victoria Christensen, was a resident of the State of Colorado and under the care of Defendants HCA-HealthOne dba Presbyterian St. Luke's Hospital and Lisa Marie White Griss M.D.

11. Defendant HCA-Healthone LLC ("HCA") dba Presbyterian St. Lukes Hospital ("HCA-PSL"), as noted in the filing of the Secretary of State for the State of Colorado, is a foreign limited liability company with a principal office mailing address of PO Box 750, Nashville, TN 37202. According to the Colorado Secretary of State, HCA has a principal office street address of 4900 S Monaco Street, Ste 380, Denver, CO 80237. HCA's registered agent for Colorado, The Corporation Service Company, has a street address of 7700 E Arapaho Road, Ste 220, Centennial, CO 80112. As previously stated, at all times herein, the Defendant HCA-Healthone LLC dba Presbyterian St. Lukes Hospital (hereinafter "HCA") was a foreign corporation doing business in Colorado and holding itself out as a full-service medical facility, available to treat patients such as Victoria Christensen (hereinafter "Christensen" or the "Plaintiff"). As previously stated, HCA-PSL is located in the City of Denver, Colorado, and is a "participating hospital" within the meaning of 42 USC section 1395dd(c)(2). As previously stated, at all times pertinent herein, HCA-PSL had an emergency department, including ancillary psychiatric and/or pediatric neurology services that were routinely available to the emergency department, capable of providing appropriate medical screening examination and care to stabilize an individual's emergency condition. At all times pertinent, HCA-PSL was a level-IV trauma center with Stroke Certification. HCA-PSL is located at 1719 E 19th Ave, Denver, CO 80218. HCA-PSL holds itself out as an institution capable of providing pediatric care, spine and joint care,

emergency, trauma, neurological, spinal, surgical, and rehab care at levels equal to the standards of care.

12.   Defendant Lisa Marie White Griss M.D., ("Griss") is a physician licensed in the State of Colorado.  At all times pertinent, Griss was the hospitalist at HCA-PSL that accepted Christensen as a transfer, noting that the transfer was for "higher care" and for "neurological consult" in Christensen's HCA-PSL medical records on November 19, 2015. At all times pertinent, Griss failed to ensure that Christensen received a bedside consult by a neurologist. Defendant Griss, as noted by the filing of the Department of Regulatory Agencies, has Physician License Number DR.0047937.

## FACTS

1.   On November 18, 2015, while 16 years old and weighing ninety (90) pounds, the Plaintiff attempted to squat 135 pounds during weightlifting class at Strasburg High School located at 56729 Colorado Ave, Strasberg, CO 80136.

2.   During the entirety of the weightlifting class on November 18, 2015, Defendant Kallweit, the weightlifting instructor, did not observe the class or Christensen, and failed to provide instruction as to squat lift technique.

3.   Instead, Defendant Kallweit chose to grade papers at her desk without observing the class.

4.   When the Plaintiff attempted to squat 135 pounds, her legs gave out, and the barbell rolled up her neck and off of her head and onto the squat rack safety bars just above the floor.

5.   Defendant Kallweit, the instructor, briefly looked up at the Plaintiff and then immediately went back to grading papers without even asking the Plaintiff if she was alright.

6.      Following the incident, the Plaintiff experienced aching in her neck, but did not experience any other symptoms and went about her day.

7.      Early the next morning of November 19, 2015, around 7am, the Plaintiff woke to a sharp pain in her neck, and her hands contracted into a fist that she could not undo.

8.      At that point, the Plaintiff alerted her father, Gregg Christensen, and he immediately drove the Plaintiff to a local physician in Strasburg, who advised the Plaintiff and her father to immediately go to the emergency room at Aurora Medical Center.

9.      Being advised to do so, the Plaintiff's father rushed the Plaintiff to Aurora Medical Center.

10.     Although the Plaintiff arrived at Aurora Medical Center's emergency room at 8:00 am, she was not checked in until 8:30am.

11.     When the Plaintiff was finally checked in, she was seen by Defendant Bosco around 8:40am.

12.     Bosco then took the Plaintiff to a private room.

13.     When first encountering PA Bosco, the Plaintiff explained that she had an accident in weight lifting class the day before.

14.     The Plaintiff also explained to Bosco that she had awoke on the morning of November 19, 2017, around 7:00am to a pop in her neck and experienced the first instance of her hands being contracted completely without being able to open them.

15.     The Plaintiff made it clear to Bosco that the pop and the contractures in her hands began less than two hours before her arrival to the emergency at HCA-Aurora Medical.

16.     Rather than listening to how and when the Plaintiff's injury occurred and when the contractures in her hands began, Bosco voiced more concern about the Plaintiff's father's

ability to pay, his insurance carrier, and his signing the Conditions of Admissions and Consent for Outpatient Care form.

17.    While initially being seen by Bosco, the Plaintiff, being very scared and trying to remain positive, smiled at her father and laughed about something to keep from being so scared or crying.

18.    In response, PA Bosco scolded the Plaintiff and her father and sternly said, "This is not a laughing matter."

19.    From that point on, PA Bosco acted as if the Plaintiff was faking her injuries.

20.    Bosco was rude to both  the Plaintiff and her father.

21.    Bosco's notes also indicate that she did not believe Christensen's injuries were consistent with a barbell falling on the Plaintiff's neck.

22.    Bosco made it clear that she did not want to listen to anything the Plaintiff or her father had to say.

23.    PA Bosco even said that she believed the Plaintiff's condition was mental and not physical.

24.    The Plaintiff attempted several times to explain to Bosco that she was in pain and scared.

25.    The Plaintiff explained again to Bosco that she thought she had injured her neck while lifting weights the day before.

26.    The Plaintiff even showed PA Bosco visible bruises on her neck where the barbell had fallen on the Plaintiff less than 24 hours before.

27.    Despite the Plaintiff's attempts to communicate with Bosco, she effectively ignored everything the Plaintiff and her father said.

28. Finally, after the Plaintiff's father completed the hospital's forms around 8:40am, Bosco had a cervical collar placed around the Plaintiff's neck, and Bosco left the room.

29. From about 8:40am until 11am, the Plaintiff and her father waited alone in the private hospital room.

30. The Plaintiff's medical records from HCA-Aurora Medical indicate that at 8:56am, Defendant Douglass ordered an MRI without contrast of the Plaintiff's brain and cervical spine without personally examining the Plaintiff.

31. Although the medical records from HCA-Aurora Medical indicate that Defendant Douglass examined the Plaintiff at 9:26am, both the Plaintiff and the Plaintiff's father maintain that the Plaintiff was not examined by Defendant Douglass.

32. Around 10:30am, the Plaintiff was taken by an unknown medical staff member to have an MRI of her brain and spine performed.

33. While the Plaintiff had the tests performed, her father waited just outside the imaging room.

34. Medical records from HCA-Aurora Medical indicate that Defendant Gunther read and interpreted the MRI of the Plaintiff's spine, but he failed to diagnose the Plaintiff with a spinal stroke or spinal infarction.

35. Medical records from HCA-Aurora Medical also indicate that Defendant Benedetti interpreted the MRI of the Plaintiff's brain, and she also failed to diagnose the Plaintiff with a spinal stroke or spinal infarction.

36. The Plaintiff's Medical records from HCA-Aurora Medical indicate the Plaintiff's MRI's were interpreted by a radiologist and reviewed by a physician assistant but not a doctor.

37.     Following the MRI, the Plaintiff was once again taken by staff back to the private room around 11:30am and given a valium and Tylenol to "calm her down."

38.     The Plaintiff's medical records indicate that the Plaintiff was reevaluated at 11:26am, but both the Plaintiff and the Plaintiff's father deny that the Plaintiff was seen by a doctor at this time.

39.     Around the same time, the Plaintiff's mother arrived at the Plaintiff's private room, and the Plaintiff's father stepped out for a few minutes to get some food.

40.     From 11:30am to 12:15pm, the Plaintiff waited patiently with her mother without word from any medical staff.

41.     At 12:15pm, when the Plaintiff attempted to get up and go use the bathroom, her legs went numb and stopped working, and the Plaintiff fell and could not walk.

42.     Luckily, the Plaintiff's mother was there to carry her to the bathroom down the hallway to the bathroom.

43.     However, the Plaintiff was unable to urinate at this point.

44.     After failing to use the bathroom, the Plaintiff's mother was there to carry her back to bed.

45.     Once the Plaintiff was back in bed, her father, who had returned from his brief walk before the Plaintiff's fall, ran to find a doctor and report what happened.

46.     Around 12:30pm, the Plaintiff's father returned with a new male doctor, Defendant Lampe.

47.     This was the first and only time the Plaintiff saw or spoke to an actual doctor while she was at the emergency room.

48.     After the Plaintiff had explained that her legs just stopped functioning and that she was unable to urinate, Dr. Lampe ordered a spinal tap to be performed on the Plaintiff, but did not explain anything else.

49.     The Plaintiff's medical records from HCA-Aurora Medical indicate that the Plaintiff was seen by Defendant Lampe at 12:34pm, and Defendant Lampe requested a spinal tap and also a consult with a pediatric neurologist.

50.     At 1:05pm, the Plaintiff's medical records indicate that Defendant Cuevas was consulted, but no special tests on the spinal tap were requested.

51.     The Plaintiff's medical records from HCA-Aurora Medical do not indicate that Defendant Lampe performed any tests on the Plaintiff to determine the extent of her urinary retention or any other diagnostic tests to investigate why the Plaintiff's legs suddenly stopped functioning.

52.     Around 2:00pm, after waiting with her father and mother, the Plaintiff had a spinal tap performed.

53.     At this point, the Plaintiff's arms and body were so numb, she could not feel the needle in her spine.

54.     The Plaintiff communicated to the medical staff that her body was completely numb, and as a result, no anesthetic was required.

55.     Despite the Plaintiff explicitly telling the staff performing the spinal tap that she could not feel her body and even though an anesthetic was not required to perform the spinal tap, the Plaintiff's medical records from HCA-Aurora Medical say at 2:54pm, "PT moving legs in bed. Strength 5/5."

56.    Although this note seems to indicate that the Plaintiff was evaluated by Defendant Douglass, the Plaintiff and her father maintain that the Plaintiff was not seen by Defendant Douglass at this time.

57.    The same medical note from HCA-Aurora Medical at 2:54 also states, "Will transferred to PSL Childrens for Neurology Cosult.  Access Center Consulted."

58.    The Plaintiff's medical records from HCA-Aurora Medical then indicate that at 3:33pm, Defendant Cuevas was once again consulted and made aware of the Plaintiff's transfer to HCA-PSL, the hospital wherein Defendant Cuevas was the on-site pediatric neurologist.

59.    At 3:51pm, the Plaintiff's medical records from HCA-Aurora Medical indicate that Defendant Griss at HCA-PSL was consulted, and she was checking to see if they have psych support prior to accepting admission.

60.    The same medical note does not mention anything about the previously requested neurological consult.

61.    However, the Plaintiff's medical records from HCA-PSL include a document entitled "EMTALA Memorandum of Transfer," which indicates the reason for the requested transfer of the Plaintiff from HCA-Aurora Medical to HCA-PSL was "higher level of care" with the medical benefit of "pediatric neurology."

62.    This same document is signed by Defendant Bosco at 4:15pm and confirms Defendant Griss as the accepting physican or hospitalist.

63.    Following the spinal tap, the Plaintiff waited in the room with her father without any doctors or staff checking in until around 8pm.

64. At 8pm, an unknown staff member entered the Plaintiff's room, informing the Plaintiff that she was being transferred to Presbyterian St. Luke's Hospital.

65. Although both the Plaintiff and her father asked  why the Plaintiff was being transferred, no staff member provided an answer.

66. Despite the Plaintiff and her father's repeated requests for a diagnosis, no staff member at Aurora Medical Center explained anything to the Plaintiff or her father.

67. The Plaintiff and her father both informed and explained to every person that they came into contact with at Aurora Medical Center about the Plaintiff's neck injury and her inability to use her hands and the numbness throughout the Plaintiff's body.

68. However, nobody at Aurora Medical Center, at any point, seemed to care.

69. At no point did any staff member explain to the Plaintiff or the Plaintiff's father her rights under the federal statute known as the Emergency Medical Treatment and Labor Act ("EMTALA").

70. Finally, the Plaintiff was transported by hospital ambulance to HCA-PSL and arrived around 9pm the night of November 19, 2015.

71. Upon arrival at HCA-PSL, the Plaintiff was immediately transported to the children's psychiatric ward.

72. The Plaintiff did not see a neurologist on November 19, 2015, or at any other point during her stay at HCA-PSL.

73. Once again, the staff at Presbyterian St. Luke's Hospital were only concerned about the Plaintiff's father's ability to pay and the completion the Conditions of Admission forms, which the Plaintiff's father was able to complete around 10pm.

74.  The Plaintiff's medical records from HCA-PSL indicate that for the entirety of the Plaintiff's stay at HCA-PSL from November 19, 2015, to November 22, 2015, Defendant Griss remained the Plaintiff's attending physician or hospitalist, but the Plaintiff maintains that she was not ever visited by Defendant Griss.

75.  The Plaintiff's medical records from HCA-PSL indicate that Defendant Mattson was the Plaintiff's ordering physican at HCA-PSL at all times on November 19, 2015, and remained the Plaintiff's ordering physican until November 20, 2015.

76.  However, the Plaintiff maintains that she was not ever visited by Defendant Mattson.

77.  The Plaintiff's medical records from HCA-PSL indicate that Defendant Loomis took over as the Plaintiff's ordering physician on November 20, 2015, and remained the Plaintiff's ordering physician until the Plaintiff's discharge on November 22, 2015.

78.  On November 20, 2015, while the Plaintiff's father and mother were both temporarily gone, a female that identified herself as a psychiatrist, but provided no credentials, came into the Plaintiff's room and spoke to the Plaintiff for about 5 minutes.

79.  The Plaintiff's medical records from HCA-PSL indicate that the female that identified herself as a psychiatrist was Defendant Greenfield.

80.  During this brief five minute exchange, the Plaintiff made it clear to Defendant Greenfield that she had a neck injury at school on November 18, 2015, and that the Plaintiff could not open her hands or feel most of her body.

81.  The Plaintiff also expressed frantically that she was worried that her condition was not improving and that she had not been seen by a doctor.

82.     Despite the Plaintiff's cries for help,  Defendant Greenfield expressed to the Plaintiff that she thought the Plaintiff was depressed.

83.     The female then stated to the Plaintiff that she would be treated for depression.

84.     The Plaintiff's medical records from HCA-PSL indicate that Defendant Greenfield prescribed the Plaintiff Zoloft, an anti-depression medication.

85.     Following this brief interaction without her parents present, the Plaintiff did not see Defendant Greenfield again.

86.     Shortly thereafter, the Plaintiff's father returned to HCA-PSL, and the Plaintiff informed her father of the unexpected visit by Defendant Greenfield while he was gone.

87.     Subsequently, the Plaintiff the Plaintiff and her father both complained to each and every Presbyterian St. Luke's Hospital staff person they saw that the Plaintiff was being incorrectly treated for depression when she had an injury to her neck.

88.     The Plaintiff's medical records indicate that the Plaintiff was subsequently visited by Defendant Hines at 2:19pm on November 20, 2015, while the Plaintiff's father was asleep.

89.     Defendant Hines' notes confirm that the Plaintiff shared that she is unsure of the care plan at that time, and she was still waiting for her father to speak with the doctors.

90.     Following this brief interaction, the Plaintiff did not see Defendant Hines again.

91.     On November 21, 2015, again when the Plaintiff was outside the presence of her parents, the Plaintiff was briefly visited by a female HCA-PSL staff member that appeared to the Plaintiff to be a physical therapist of sorts.

92.     During this brief visit, the female staff member provided the Plaintiff with an exercise ball and showed the Plaintiff a few hand exercises.

93.   In response, the Plaintiff once again complained that she had not been seen by a doctor and that her condition of paralysis in her arms and legs was not improving, but the staff member did not offer any explanation or confirm that she would speak the Plaintiff's physician before she left the Plaintiff's room.

94.   The Plaintiff did not see this staff member again.

95.   A short note by Defendant Loomis indicates that the female staff member that visited the Plaintiff was Defendant Rosenburg.

96.   Throughout her stay at HCA-PSL, the staff that the Plaintiff did see ignored her constant complaints about numbness her body and her inability to open her hands.

97.   At no point did anyone at Presebyterian  St Luke's Hospital listen to the Plaintiff's cries for help.

98.   Instead of doing more tests to see why the Plaintiff's hands were numb or why her hands couldn't open, the staff gave the Plaintiff depression medication and treated her as a psyche patient.

99.   During the Plaintiff's entire time at HCA-PSL, other than the Plaintiff's two isolated and brief interactions with Defendants Greenfield and Rosenburg, neither the Plaintiff nor her father ever spoke to or saw a doctor until less than an hour before her discharge on November 22, 2015.

100.  Then, suddenly and without warning, on November 22, 2015, the Plaintiff and her father were informed by Defendant Loomis that the Plaintiff was being discharged from Presbyterian St. Lukes that same day.

101.   During this brief interaction immediately prior to the Plaintiff's discharge, Defendant Loomis confirmed to the Plaintiff and to the Plaintiff's father that the Plaintiff had been diagnosed with conversion disorder.

102.   Unfamiliar with this condition, the Plaintiff and her father demanded an explanation, but Defendant Loomis did not elaborate or explain the condition in any way.

103.   At this point, the Plaintiff had not been seen by a neurologist at any point while at the emergency room of HCA-Aurora Medical or since her emergency transfer to HCA-PSL specifically for higher care in the form of a neurological consult.

104.   After being discharged from Presbyterian St. Luke's Hospital on November 22, 2015, the Plaintiff's father took the Plaintiff to Colorado University Children's hospital, where the Plaintiff was sent to occupational therapy for conversion disorder pursuant to the prior diagnosis made by the medical staff at HCA-Aurora Medical and/or HCA-PSL.

105.   Finally, on February 8, 2016, after months without improvement, Dr. Amy Kanallakan M.D. of Colorado University Children's Hospital performed a few basic sensory and reflex tests, and stated to the Plaintiff and her father that the Plaintiff's symptoms did not match the diagnosis of conversion disorder.

106.   Dr. Kanallakan then ordered an MRI re-imaging with contrast of the Plaintiff's neck.

107.   The MRI with contrast was performed on February 21, 2016.

108.   On February 23rd, 2016, in the presence of the Plaintiff's father and the Plaintiff's occupational therapist Tess Simpson, Dr. Kanalikan showed the Plaintiff the new MRI with contrast results alongside the MRI without contrast results previously taken on November 19, 2015, at HCA-Aurora Medical.

109.   At the same time, Dr. Kanalikhan explained what the new MRI with contrast showed.

110.   During her explanation of both sets of MRIs, Dr. Kanalikan confirmed to the Plaintiff and her father that the Plaintiff had in fact experienced a "spinal stroke" as a consequence of the school squatting accident.

111.   Shocked, the Plaintiff's father asked Dr. Kanalikan if the spinal stroke was visible in the original MRI from Aurora Medical, and Dr. Kanalikan responded yes.

112.   According to Dr. Kanalikan, the spinal stroke was very visible in the new MRI images "with contrast," but at the same time, the spinal stroke was also visible in the original MRI images without contrast taken on November 19, 2015, at HCA-Aurora Medical.

113.   At that point, Dr. Kanalikhan informed the Plaintiff that the paralysis in her arms would not improve, and the feeling and functionality in the Plaintiff's hands and arms would never return.

114.   The Plaintiff's condition remains the same today.


**FIRST CLAIM FOR RELIEF**
**VIOLATION OF 42 USC 1395dd, et seq.**
**(November 19, 2015 – November 22, 2015)**

115.   The Plaintiff hereby repeats all other paragraphs of this Complaint by reference, as if fully set forth herein.

116.   Under the Emergency Medical Treatment and Active Labor Act, 42 USC 1395dd, if an individual comes to a hospital and the hospital determines that the individual has an "emergency medical condition" within the meaning of the Act, the hospital must provide appropriate emergency medical screening and if it determines that an individual suffers

from an emergency medical condition, provide such treatment as may be required to stabilize the medial condition before transfer or discharge of the individual, as provided by the act.

117.   The term "emergency medical condition" as used in the Act means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing the individual's health in serious jeopardy; serious impairment to bodily functions; or serious dysfunction of any bodily organ, and includes psychiatric conditions.

118.   Under the Act, a medical condition is "stabilized" when no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer, or discharge, of the individual from a facility.

119.   Under the Act, a participating hospital may not delay provision of an appropriate medical screening examination, or further medical screening examination and treatment necessary to stabilize the emergency medical condition in order to inquire about the individual's method of payment or insurance status or for any other reason.

120.   Under the Act, if an individual at a hospital has an emergency medical condition which has not been stabilized, the hospital may not transfer the individual unless a physician has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual.

121.   Under the Act, an appropriate transfer to a medical facility is a transfer in which the receiving facility has available space and qualified personnel for the treatment of the

individual, and has agreed to accept the transfer of the individual and to provide appropriate medical treatment.

122.    Under the Act, any individual who suffers personal harm as a direct result of a participating hospital's violation of the Act may obtain damages for personal injury from the participating hospital.

123.    The Plaintiff, Victoria Christensen, has sustained personal harm as a direct result of HCA-PSL's violation of provisions of the Act.

124.    On November 19, 2015, Christensen had an "emergency condition" within the meaning of EMTALA.  Her "emergency medical condition" included, but was not limited to: acute paralysis of the hands, acute paralysis of the arms, acute paralysis of the legs, inability to urinate, inability to walk, numbness throughout her whole body, and visible bruising from blunt trauma to the neck.

125.    Although Christensen originally arrived at Aurora Medical Center's emergency room, this facility was not equipped with the staff to stabilize Christensen's "emergency medical condition" as there was not a neurologist on site.

126.    Thus, Aurora Medical Center Staff requested that Christensen be transferred to HCA-PSL, a facility equipped with the staff necessary to address Christensen's "emergency medical condition."

127.    Defendant Griss received the request from Aurora Medical Center and was provided a copy of the EMTALA Memorandum of Transfer, which clearly states under section III Risk and Benefits for Transfer that the transfer is medically necessary to "(o)btain level of care/service unavailable at this facility: Pediatric neurology: Psych."

128.   Subsequently, Defendant Griss accepted Christensen as a transfer, and Christensen was transported to HCA-PSL.

129.   Once Christensen was admitted to HCA-PSL by Dr. Griss, hospitalist, under the above mentioned criteria, Defendants HCA-PSL and Griss owed duties to Christensen to: (1) provide appropriate medical care including but not limited to ensuring that Christensen be evaluated by a pediatric neurologist at HCA-PSL , which was the basis for the EMTALA transfer; (2) ensure Christensen's continuum of care (3) refrain from refusing Christensen's admission into the pediatric neurology department of HCA-PSL; (4) provide Christensen with screening and treatment that was in compliance with the EMTALA; (5) refrain from discharging Christensen in violation of the EMTALA; and (6) avoid personal harm to Christensen as a result of violation of the Act.

130.   Defendants HCA-PSL and Griss breached its legal duties under EMTALA and is liable to Christensen, based on the following:

(a)   After accepting Christensen's transfer and agreeing to provide appropriate medical treatment in the form of a neurological consult, Defendants Griss and HCA-PSL failed to provide a neurological consult or ensure that Christensen was evaluated by a neurologist at any time during her stay at HCA-PSL from November 19, 2015 until her discharge on November 22, 2015.

131.   Additionally, once Christensen was discharged from HCA-PSL on November 22, 2015, HCA-PSL had a duty schedule a follow up appointment with the appropriate specialist for neurological deficit in bilateral upper extremities, which would be a neurologist.

132. Defendants HCA-PSL and Griss also breached this legal duty under EMTALA based on the following:

(a) After discharging Christensen, Defendants HCA-PSL and Griss failed to arrange for Christensen to have a follow up appointment with a neurologist regarding her neurological deficit in bilateral upper extremities.

133. At all times pertinent herein, HCA-PSL had pediatric neurologists on site and available for consult.  Thus, Defendants HCA-PSL and Griss had the capabilities to provide a neurological consult as mandated in the EMTALA Memorandum of Transfer.

## DAMAGES

134. As a result of the acts and omissions of Defendants HCA-PSL and Lisa Marie White Griss as stated herein, Victoria Christensen has endured direct personal harm. Christensen has permanently lost the functional use of her hands and arms. Christensen has suffered permanent injuries, damages and losses expressed herein, including past and future medical bills, household services, lost income, impairment of earning capacity, pain, suffering, mental distress, physical impairment, loss of her ability to do every day activities that require the functional use of her hands and arms, loss of enjoyment of life, and impairment to the quality of her life. Christensen has incurred unnecessary medical expenses.  Christensen will require future surgery, future medical treatment, future physical therapy, household services, personal assistance, transportation, medical devices and modifications to her living quarters at a minimum estimated cost of $3,613,300, present value.  Christensen can no longer pursue occupations that require the ability to type, as a result, has suffered an

impairment to her earning capacity at a minimum estimated amount of $647,500, present value.  Christensen will suffer lifetime non-economic and physical impairment injuries and damages.

**WHEREFORE,** the Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants, and grant:

(a)     Compensatory and consequential damages;

(b)     General damages for emotional distress, loss of enjoyment of life, PTSD, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)     All other economic losses on all claims allowed by law;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and the costs associated with this action on all claims allowed by law;

(f)     Pre- and post-judgment interest at the lawful rate; and

(g)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTs A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

**Dated this 19th day of November, 2017**

PLAINTIFF
Victoria Christensen
By: Embry & Associates, LLC


_____ /s/ Blake Embry_____

Blake Embry
1624 Market Street
Suite 202
Denver, CO 80202
303 815 5405
blakeembry@blakeembrylaw.com